The execution of the notes by defendant, both dated 15 July, 1920, one for $400, due 1 November, 1920, and the other for $300, due 1 March, 1921, and payable to plaintiff, a corporation organized under the laws of this State, was admitted; it was also admitted that no payment had been made on said notes, or either of them, and that both were past due when this action was begun.
For a defense to plaintiff's cause of action upon said notes, defendant, in his answer, alleged that said notes were null and void, for the reason that they were obtained from defendant by false and fraudulent representations, as set out in the answer, and for the further reason that the consideration for the said notes was the purchase price of seven shares of the capital stock of plaintiff corporation sold to defendant by an agent of plaintiff; that the sale of the said stock was made in violation of section 6367 Consolidated Statutes of North Carolina; that the contract for sale of said stock was not in writing and did not contain the provision required by said statute and that said stock has not been issued or delivered to defendant.
After the institution of this action, plaintiff became insolvent, and the receiver appointed by the court has been made a party plaintiff to this action.
After the pleadings were read at the trial, the court held, without objection, that upon the admissions contained in the answer and entered formally in the record, defendant was entitled to open and conclude, and that "plaintiff was entitled to recover upon the notes set out in the complaint, unless the jury should find by the greater weight of the *Page 421 
evidence that the notes were without consideration, and were procured by false and fraudulent representations as alleged in the answer."
Defendant offered as evidence the testimony of himself and of Marvin Wade, agent of plaintiff.
This evidence tends to show that Mr. Wade, agent of the Seminole Phosphate Company, on or about 15 July, 1920, negotiated a contract with defendant, by which plaintiff sold to defendant seven shares of the capital stock of plaintiff, of a new issue, and of the par value of $700; that the notes set out in the complaint were executed for the purchase price of said stock; that no writing containing the provision required by C. S., 6367, was signed by plaintiff or defendant; that no writing containing said provision was shown by the agent to defendant; both defendant and the agent testified that they did not remember whether the contract of sale of said stock was in writing or not, and the agent testified that he did not carry any contracts with him and that he did not show to defendant any contract containing the provision required by the statute; that the total amount of the new issue of stock was one million dollars, and the money was to be used for building a new plant at Raleigh.
The evidence further tended to show that the agent told defendant that a dividend of 14 per cent had been declared on the first issue of stock, then outstanding and that same would be paid immediately; defendant owned three shares of said first issue; that the stock sold would be issued upon receipt by the plaintiff of the notes; that the stock has never been tendered to defendant by plaintiff, and that defendant has not received anything of value for said notes; that no dividend has ever been paid or tendered to defendant on the shares of stock of the first issue owned by him; that the agent was instructed by plaintiff to pay 14 per cent dividend on the first issue of stock in fertilizers, or by crediting indebtedness of stockholders to the company; the agent testified that if defendant had paid his notes, he would have received credit for a dividend of 14 per cent on the shares owned by him, of the first issue.
The agent testified that plaintiff promised to pay him a commission of 10 per cent on the amount of stock sold by him, but that no commission had been paid upon the sale to defendant, because the notes had not been paid.
Ellis Goldstein was sworn as a witness for defendant and offered to testify that he agreed to purchase a portion of the second issue of stock in plaintiff company from an agent of the company; that he gave his note for said stock, upon plaintiff's agreement that said stock would be issued immediately upon receipt of his note; that said stock has never been issued and delivered or tendered to him. Plaintiff's objection to *Page 422 
this testimony was sustained and defendant excepted. This is defendant's first exception.
At the conclusion of the evidence plaintiff moved for judgment upon the pleadings. No issues were submitted to the jury, and judgment was signed by his Honor as follows:
"This cause coming on to be heard, and being heard before his Honor, Garland E. Midyette, and a jury, and it appearing to the court that the execution of the notes in question is admitted, and that defendant has failed to produce any staple evidence in support of any defense to the payment of the notes:
"Now, therefore, it is considered, ordered and adjudged that plaintiff recover of defendant the sum of six hundred fifty-eight dollars, with interest thereon from 1 November, 1920, together with the costs of this action to be taxed by the clerk."
Defendant excepted to the order sustaining plaintiff's motion for judgment upon the pleadings and to the judgment as signed by his Honor and these were defendant's second and third exceptions.
Defendant appealed from the judgment rendered. The case on appeal, appearing in the transcript sent to this Court, was settled by agreement of attorneys for plaintiff and defendant.
Defendant's exception to the exclusion of the testimony of the witness Goldstein, offered by defendant as evidence upon his allegation that the execution of the notes was procured by fraudulent representations, must be sustained. This testimony was competent as evidence tending to establish a fact proper to be considered by the jury in determining whether or not the same representation, if made to defendant, was fraudulent. If the jury should find that in selling to another stock of the same series as that sold to defendant, the same representation was made to both as an inducement to purchase the stock, and that plaintiff had failed to comply with its agreement with both purchasers, this would be a circumstance which the jury could properly consider in determining whether or not the representation was made to defendant with fraudulent intent. Brink v.Black, 77 N.C. 60; Robertson v. Halton, 156 N.C. 215. There was error in sustaining plaintiff's objection to this testimony.
In the case on appeal, agreed upon by attorneys for plaintiff and defendant, it is stated that, at the beginning of the trial, after the court had held, without objection, that by reason of the admissions in the answer, "the burden was upon defendant to satisfy the jury, by the *Page 423 
greater weight of the evidence, that the notes were without consideration and were procured by false and fraudulent representations, the court further held as a matter of law that the notes are for value unless the defendant satisfies the jury by the greater weight of the evidence that the consideration for the notes was without value." No exception is noted to such holding.
In the judgment signed by his Honor there is a recital that "it appearing to the court that the execution of the notes in question is admitted, and that defendant has failed to produce any staple evidence in support of any defense to the payment of said notes, it is therefore ordered, considered and adjudged that plaintiff recover of defendant." Defendant excepted to the ruling of the court upon plaintiff's motion at the conclusion of the evidence for judgment upon the pleadings and also to the judgment as signed.
A careful consideration of the foregoing statement and of the recital in the judgment leaves us in some uncertainty as to whether his Honor held as a "matter of law" that the defense based upon the allegations that the notes were null and void — for the reason that the contract for the sale of the stock was illegal, because not reduced to writing as required by C. S., 6367 — would not avail defendant, or whether he held that defendant had failed to produce evidence in support of such defense. Evidence was offered from which the jury could have found that the contract of sale of stock by Wade, as agent of plaintiff to defendant, was not in writing and did not contain the provision required by C. S., 6367, relative to amount to be paid as commission for making the sale; and that the notes were given for stock in plaintiff company, sold in violation of this statute. There was also evidence that the company had agreed to pay the agent, who negotiated the sale, 10 per cent of the amount received as purchase price of the stock as his commission. We must therefore conclude that his Honor held that the defense was not available to the defendant in this action, as "a matter of law," and that plaintiff could recover on the notes, notwithstanding the facts which the jury might find from the evidence.
We are advertent to the fact that there has been some uncertainty, and some doubt expressed as to whether C. S., 6367 applies to sales of stock in corporations organized under the laws of this State. Suggestions have been made that this section applies only to sales of stock by foreign companies; that is, by companies organized under the laws of other states and seeking to do business in this State.
Section 6367 of the Consolidated Statutes is subsection 4 of section 1 of chapter 156, Public Laws of 1913. This statute amends subchapter 14, chapter 100 of the Revisal of 1905; that is, section 4805 of the Revisal, and provides that section 1 of chapter 156, Public Laws 1913, *Page 424 
shall be section 4805A of the Revisal. Section 4805 of the Revisal of 1905, provides that "before any bond, investment, dividend, guarantee, registry, title guarantee, debenture, or such other like company (not strictly an insurance company as defined in this chapter) shall be authorized to do business in this State, it must be licensed by the Insurance Commissioner of North Carolina." Specific reference is made to such companies chartered and organized in this State, and the statute by its express terms applies to such domestic as well as foreign companies. It provides that all such companies, whether organized without the State or within the State, doing business in this State, shall be licensed by and under the supervision of the Insurance Department of North Carolina.
Chapter 156, Public Laws 1913, by its express provision, applies to "every corporation company, copartnership, or association, organized, proposed to be organized, or which shall hereafter be organized, without
this State, which shall in this State sell or negotiate for sale any stocks, bonds, or other evidences of property or interest in itself or any other company, all of which are in this act termed securities, upon which sale or proposed sale the whole or any part of the proceeds are used or to be used, directly or indirectly, for the payment of any commission or other expenses incidental to the organization or promotion of any such company." This act was ratified on 12 March, 1913; subsection 4, section 1 of the act is now C. S., 6367. As originally enacted, it did not apply to sales of stock by domestic corporations, but did apply to all corporations, organized without the State, selling stocks, etc., within the State, where commissions were paid on the sales or deductions were made from the proceeds of the sale for organization expenses. Its effect was to include within its provisions corporations not included within section 4805 of the Revisal of 1905, and to enlarge the supervisory powers of the Insurance Department. It also extended these powers to agents of the corporation, and required these agents to procure license before transacting or offering to transact business in the State as agents of such companies, and made the violation of any provision of the act by an agent a misdemeanor, punishable by fine or imprisonment.
Prior to 1919 domestic corporations, included within section 4805 of the Revisal of 1905, were only required to procure license before engaging in business in North Carolina; the more effective provision of section 4805A (chapter 156, Public Laws 1913) applied only to foreign corporations doing business included within the terms of said statute.
By chapter 121, Public Laws 1919, said section 4805A was amended by adding the following: "Provided, that this act and its provisions shall apply also to every corporation, company, copartnership or association organized or to be organized in this State, where such company or *Page 425 
organization by its organizers or promoters puts or proposes to put the stock of the company on the market in person or by agents." This act was ratified 3 March, 1919.
The effect of this amendment was to make all the provisions of section 4805A applicable to domestic as well as foreign corporations. Section 4805, and section 4805A of the Revisal of 1905, with all amendments, appear in the Consolidated Statutes as Article 10, chapter 106, sections 6363-6375, inclusive. The law upon this subject since 1 August, 1919 (C. S., 8107) is contained in these statutes. Section 6367 of Consolidated Statutes applies to both domestic and foreign corporations, corporations organized within as well as without this State, which put or propose to put the stock of the company on the market in person or by agents.
It is true, as is earnestly urged upon us by plaintiff's attorney, in his brief and on the argument of this appeal, that chapter 121, Public Laws 1921, now appears in C. S., 6363, and seems to be limited in its operation to this section. When, however, the history of this legislation, together with the conditions which have prevailed from time to time in this State, since the enactment of chapter 156, Public Laws 1913, and with which it was the manifest purpose of the General Assembly to deal, is considered, this construction ought not and cannot be sustained. The evil sought to be remedied has been progressive, as appears from the dockets of this Court, and as all men in this State know, the General Assembly has been prompt to amend and strengthen the laws designed to protect the people of the State by making the statutes more comprehensive, and the powers of the Insurance Commission more effective. A construction of these statutes, highly remedial, and hurtful to no honest person or corporation, doing business in the State, favorable to corporations and their stock salesmen, who are eager to pay or to receive excessive commissions, or to deduct from sums paid in as capital stock excessive amounts for promotion and organization expenses, ought not to be adopted by the courts — rather the courts should construe these statutes so that they may lessen the evil and advance the remedy.
At its sessions in 1921 and 1923, the General Assembly has further amended these statutes (ch. 233, Public Laws 1921 and ch. 180, Public Laws 1923), but as these amendments are not applicable to this action, they need not be discussed.
"In the case of a general revision or codification of statutes it is well settled that a mere change or phraseology or the omission or addition of words will not necessarily change the operation or construction of former statutes, for the new language may be attributed to a desire to condense and simplify the law. The language of the *Page 426 
statute as revised or the legislative intent to change the former statute must be clear before it can be pronounced that there is a change of such statute in construction and operation." 25 R. C. L., 1050.
"Revisers of statutes are presumed not to change the law if the language which they use fairly admits of a construction which makes it consistent with the former statutes; and it is a well settled rule that in the revision of statutes neither an alteration in phraseology, nor the omission or addition of words in the latter statute shall be held necessarily to alter the construction of the former act, excepting where the intent of the Legislature to make such change is clear." 33 Cyc., 1067. Hughes v. Smith,64 N.C. 493; In re Jenkins, 157 N.C. 430.
"A statute should be construed as a whole, and not by the wording of any particular section or part of it. The law requires that, in the interpretation of a statute, we should give it that meaning which is clearly expressed, and if there is doubt or ambiguity we should construe it so as to ascertain from its language what was the true intention of the Legislature." McLeod v. Comrs., 148 N.C. 86; S. v. Bell, 184 N.C. 701.
The sale of stock in the plaintiff corporation for which the notes sued on were given was made in July, 1920. At this time C. S., 6367 was in full force and effect, and applicable to this sale. There is evidence that this sale was not made in compliance with the terms and provisions of this statute; this is expressly set up as a defense to the plaintiff's action on the notes. What is the effect upon plaintiff's right to recover if the jury shall find that the notes were given for the purchase of stock sold without compliance with C. S., 6367?
This Court has said in Fashion Co. v. Grant, 165 N.C. 453, Brown, J., writing the opinion: "It is well settled that the courts of a state will not lend their aid to the enforcement of a contract which violates the positive legislation of the State of the forum. The principle of the rule is that no man ought to be heard in a court of justice who seeks to enforce a contract founded in or arising out of moral or political turpitude. Where a party is privy to the original illegal contract or transaction, then he is not entitled to recover any advance made by him connected with the contract."
In Culp v. Love, 127 N.C. 460, Faircloth, C. J., writing for the Court says: "The objection of a party to an illegal contract does not sound well in his mouth. It is not for his sake that the objection is allowed, but it is found in general principles of policy, of which he has the advantage by the accident of being sued by his confederate in wrongdoing; an executory contract, the consideration of which is contra bonos mores, or against the public policy, or laws of the State, *Page 427 
or in fraud of the State, or of any third person, cannot be enforced in a court of justice. Blythe v. Lovinggood, 24 N.C. 20."
The distinction is sometimes made between contracts malum in se and contracts malum prohibitum, but this distinction is not recognized in this State. Annuity Co. v. Costner, 149 N.C. 294.
An action cannot be maintained in the courts of this State upon a note or an account, the consideration of which is intoxicating liquor sold in violation of law. Pfeifer Co. v. Israel, 161 N.C. 410; Vinegar Co. v.Hawn, 149 N.C. 355; Bluthenthal v. Kennedy, 165 N.C. 372.
A contract made in violation of chapter 167, Public Laws 1911 (C. S., 2563, subsection 2), Anti-Trust Act, will not be enforced by the courts of this State. Fashion Co. v. Grant, supra.
A note given for the purchase price of stock-food sold in this State in violation of C. S., 4742, will not be enforced in this State. Miller v.Howell, 184 N.C. 119.
In Courtney v. Parker, 173 N.C. 479, Hoke, J., (now the honored ChiefJustice of this Court) holding that there can be no recovery on a contract made in violation of chapter 77, Public Laws 1913 (amended by chapter 2, Public Laws 1919, by expressly providing that failure to comply with statute shall not affect civil liability on a contract made by or with a partnership which has not complied with statute), C. S., 3288, says: "It is well established that no recovery can be had on a contract forbidden by the positive law of this State, and the principle prevails as a general rule whether it is forbidden in express terms or by implication arising from the fact that the transaction in question has been made an indictable offense or subjected to the imposition of a penalty."
In Covington v. Threadgill, 88 N.C. 186, plaintiff's cause of action was founded upon notes and account; the defense was that the consideration for said notes and account was intoxicating liquor sold to defendant by plaintiff, and defendant relied upon statute, which was as follows: "No retailer of liquors by the small measure shall sell to any person, on credit, liquors to a greater amount than ten dollars unless the person credited sign a book or note in the presence of a witness in acknowledgment of the debt, under the penalty of losing the money so credited."
Chief Justice Ruffin, writing for the Court, says: "The plaintiff however, insists that inasmuch as the statute does not in positive terms declare the act of selling, though upon a credit and in excess of the designated amount, to be unlawful, but simply prescribes the penalty for it, its effect is not to make the selling so absolutely illegal, as that it will vitiate the whole of the note or other contract, of which it may *Page 428 
form, in part; the consideration. A distinction like that attempted to be made, between the effect, in this regard, of statutes which affirmatively declare acts done in contravention of their provisions to be unlawful, and those which merely visit such acts with penalties, has been at times, and perhaps still is, recognized in some of the authorities, but never in the courts of this State." He cites and approves the following from the opinion in Sharp v. Farmer, 20 N.C. 255: "After a vast number of cases, upon the subject, it seems now to be perfectly settled, that no action will be sustained in affirmance and enforcement of an executory contract to do an immoral act, or one against the policy of the law, the due course of justice or the prohibition of a penal statute. The distinction between an act malum in se and one malum prohibitum was never sound and is entirely disregarded; for the law would be false to itself if it allowed a party through its tribunals to derive advantage from a contract made against the intent and express provisions of the law."
The courts of this State have uniformly and consistently held that contracts founded upon or growing out of acts or transactions, which have been declared unlawful by statutes, making such acts or transactions crimes and misdemeanors, and prescribing punishment for their violation, or which have been prohibited by statutes prescribing a penalty to be enforced against those who fail to conform to or who disregard the provisions of such statutes in matters to which such statutes are applicable, or which are merely prohibited by statutes, without regard to whether such acts or transactions are punishable as crimes and misdemeanors, or subject those who fail to conform to or disregard them, to penalties, where the manifest purpose of the General Assembly in enacting them is to safeguard and protect the people of the State from such acts or transactions, either by forbidding them or by prescribing the manner and form or the terms and conditions upon which such acts may be done or such transactions entered into — will not be enforced in this State.
In Planters Bank and Trust Co. v. Felton, ante, 384, this Court has said, Justice Clarkson writing the opinion, in which he discusses the effect of a violation of C. S., 6367 upon a contract, in which the parties did not comply with the statute, "The question arises, if these provisions are not complied with, is a note given for stock enforceable in the courts of this State? We think not, as between the parties. The courts will not lend their aid to enforce the collection of a note between the parties, given without complying with the statute and which makes the officer or agent who violates this provision of the act guilty of a crime. It would be contrary to public policy. The transaction is illegal — voidable, not void." *Page 429 
A full and comprehensive statement of the law with full citation of authority, with reference to this matter, will be found in Corpus Juris, Vol. 13, p. 420 et seq. It is there stated: "Where a statute expressly declares that certain kinds of contracts shall be void, there is then no doubt of the legislative intention, and an agreement of the kind voided by the statute is unlawful. The same is true where the contract is in violation of a statute, although not therein expressly declared to be void. It is immaterial whether the thing forbidden is malum in se or merely malumprohibitum. A statute prohibiting the making of contracts, except in a certain manner, ipso facto, makes them void if made in any other way."
Again, "Frequently a statute imposes a penalty on the doing of an act, without either prohibiting it or expressly declaring it illegal or void. In cases of this kind, the decisions of the courts are not in harmony. The generally announced rule is that an agreement founded on or for doing such penalized act is void."
Again, "If an act is prohibited by statute, an agreement in violation of the statute is void, although the act is not penalized, for it is the prohibition, and not the penalty, which makes the act illegal. Smathers v.Ins. Co., 151 N.C. 98; 6 R. C. L., p. 699, Article on Contracts, sec. 105.
We must therefore sustain defendant's assignment of error based upon his exceptions to the order allowing plaintiff's motion for judgment on the pleadings and to the judgment as signed by his Honor. Issues should have been submitted to the jury. If upon a new trial, a verdict shall be rendered sustaining the allegations in the answer that the notes sued on were executed pursuant to a contract made without compliance with C. S., 6763, then the contract or sale as between the original parties was illegal and no recovery can be had on the notes. The law as to the rights of an innocent holder for value of notes executed pursuant to a contract made in violation of this section is not involved in this action. In Bank v.Felton, supra, it is held that such notes as between an innocent holder for value and the maker, are not void.
The fact that the plaintiff corporation, since the beginning of this action has been declared insolvent and that a receiver has been appointed, does not affect the rights of defendant in this action. The receiver takes whatever title the corporation had to the notes and no more. Mfg. Co. v.Buggy Co., 152 N.C. 633.
As there must be a new trial we shall not discuss defendant's exception for that his Honor held that the evidence offered was not sufficient to sustain the allegation that the notes were procured by false and fraudulent representations. Defendant, however, testified that the agent told *Page 430 
him that a dividend had been declared by the company on the first issue of stock of 14 per cent and that the same would be paid immediately. This statement, if made, was in effect a representation that the corporation had a surplus of net profits arising from its business of at least 14 per cent or that its debts, whether due or not, did not exceed two-thirds of its assets; C. S., 1179. Defendant further testified that no dividend has ever been paid to him, although he was the holder of three shares of the outstanding stock of the corporation.
Defendant further testified that the agent stated to him that the stock for which the notes were executed would be issued to defendant at once and that no stock or certificates for same have been issued or tendered to defendant; that the money derived from the sale of the new stock of the second series, amounting to one million dollars, would be invested in the building of a new plant at Raleigh. It is true that there is no evidence as to whether or not a plant costing a million dollars or thereabouts, has been built at Raleigh. If upon the new trial this and other evidence is offered, it will be for the court then to determine whether the law as declared in DesFarges v. Pugh, 93 N.C. 32, is applicable.
New trial.