MARRIOTT FINANCIAL SERVICES, INC. v. CAPITOL FUNDS, INC. AND LAWYERS TITLE INSURANCE CORPORATION

No. 97

(Filed 27 August 1975)

1. Contracts § 6— statutory penalty — contract in derogation of statute

The statutory imposition of a penalty, without more, will not invariably avoid a contract which contravenes a statute or ordinance when the agreement or contract is not immoral or criminal in itself; in such cases the courts may examine the language and purposes of the statute, as well as the effects of avoiding contracts in violation thereof, and restrict the penalty for violation solely to that expressed within the statute itself.

2. Deeds § 7; Municipal Corporations § 30; Vendor and Purchaser § 3— subdivision control ordinance — reference to unapproved plat — misdemeanor — validity of deed

Enabling statute and city ordinance making it a misdemeanor to describe land in a deed by reference to a subdivision plat which has not been properly approved and recorded does not render a conveyance of land illegal and subject to rescission on the ground that the seller did not obtain city council approval of a subdivision plat as required by the ordinance.

3. Cancellation and Rescission of Instruments § 4— rescission for mutual mistake

In order for the remedy of rescission to be operable because of mistake of fact, there must be mutual mistake of fact; a unilateral mistake, unaccompanied by fraud, imposition, undue influence, or like oppressive circumstances is not sufficient to avoid a contract or conveyance.

4. Cancellation and Rescission of Instruments § 4— unilateral mistake — validity of land sale

A sale of land was not subject to rescission on the ground of mutual mistake of fact for the reason that the purchaser acted under the mistaken assumption that an effective driveway permit for the land had been obtained by its assignor of an option to purchase the land where there was no evidence tending to show that this mistaken assumption was induced by any misrepresentation, deceitful action or misleading silence on the part of the seller, that the seller knew of the specific purpose for which the purchaser intended to use the property, or that the seller knew or should have known that the purchaser mistakenly believed that a driveway permit had been obtained, and where the means of information were equally open to all parties to the transaction and the purchaser made no investigation or inquiry concerning access to the land but chose to proceed on its limited knowledge or to assume the sole risk of error.

Financial Services v. Capitol Funds

5. Cancellation and Rescission of Instruments § 2— cancellation for fraud — absence of representations

   A sale of land was not subject to rescission on the ground of fraud where there was no evidence tending to show that the seller, with fraudulent intent, made a false representation of a material fact which the purchaser relied upon to its injury.

6. Contracts § 16— sale of land — driveway permit not condition precedent

   In an action to rescind a sale of land, the trial court properly concluded that the issuance of a valid driveway permit by a city was not a condition precedent of the contract of sale.

7. Insurance § 6— construction of policy language

   The test in construing the language of an insurance contract is not what the insurer intended the words to mean, but what a reasonable person in the position of the insured would have understood them to mean.

8. Insurance § 148— title insurance — lack of access — character of property

   When an insurer contracts to insure against lack of access to property, it must be deemed to have insured against the absence of access which, given the nature and location of the property, is reasonable access under the circumstances; and where the subject property lies adjacent to a heavily traveled street in a city and is located in a commercial area heavily populated with restaurants, stores and automobile dealerships, mere pedestrian access cannot be deemed reasonable access, and the policy will be construed to protect against lack of vehicular access.

9. Insurance § 148— title insurance — exclusion for exercise of police power — lack of access

   A title insurance policy did not insure against lack of vehicular access to the subject property where a policy provision excluded from coverage any loss or damage by reason of exercise of governmental police power unless notice of the exercise of the police power appears in the public records on the effective date of the policy, and a city council resolution rejecting the purchaser's application for subdivision approval after the policy date makes it clear that the city council would exercise its police power to deny any application for a driveway permit to the property, or any other property within 200 feet of a bridge located at one corner of the property.

ON *certiorari* to review the decision of the Court of Appeals, 23 N.C. App. 377, 209 S.E. 2d 423, which affirmed in part and reversed in part the judgment of *McLelland, J.,* 28 January 1974 Session of WAKE County Superior Court.

This civil action was instituted by plaintiff Marriott Financial Services, Inc., (Marriott) to rescind a sale of land from Capitol Funds, Inc., (Capitol) or, in the alternative, to recover

on a title insurance policy issued by defendant Lawyers Title Insurance Corporation (Lawyers Title). By agreement of the parties, the case was heard without a jury.

The subject property is a tract of land fronting approximately two hundred forty feet on the west side of Old Wake Forest Road in Raleigh. The property has a depth of one hundred fifty feet, and its southern boundary is the center line of Crabtree Creek, which flows under a bridge carrying Old Wake Forest Road over the creek at the southeast corner of the property. This property is a portion of a larger tract formerly owned by Capitol. In 1967 Capitol conveyed to Al Smith Buick, Inc., (Al Smith) a portion of this larger tract fronting on Old Wake Forest Road and adjoining the subject property on the north and west. In connection with this conveyance, Capitol made no application to obtain the approval of the Raleigh Planning Commission or the Raleigh City Council under the provisions of the Subdivision Standards Ordinance of the City of Raleigh. However, subsequent to the conveyance, Al Smith did apply for and obtain such approvals. In connection with this application, a plat entitled "Property of Al Smith Buick, Inc.," was submitted to and approved by the City Council and recorded in the Office of the Register of Deeds of Wake County. This plat showed the boundary of the lot which Capitol conveyed to Al Smith as well as the adjoining lot, title to which still remained in Capitol. Before Raleigh officials approved this plat for recording, a notation was placed thereon opposite an arrow which pointed to the subject property and bore the following notation: "Not an Approved Lot." This notation was on the plat when it was signed by the corporate secretary of Capitol.

A. C. Hall, Jr., Director of City Planning for the City of Raleigh, testified that he was familiar with the subject property. He further testified that the Raleigh City Council, because of the heavy traffic on Old Wake Forest Road, had adopted a policy, not specifically embodied in any ordinance, of denying any driveway connections into Old Wake Forest Road within one hundred fifty or two hundred feet from the abutments on the bridge over Crabtree Creek. The City Council did not approve the lot shown on the Al Smith plat because "they suspected that had they done so they would have been a party to having to allow a driveway, which they didn't want to do."

In 1968 Walter L. Pippin, a real estate broker from Greensboro who dealt primarily in commercial and industrial properties, became interested in the subject property. Pippin had made it his practice to search for locations which he thought were suitable for businesses and then "either list them or take an option on them and try to find a buyer." From the tax records Pippin determined that the subject property was owned by Capitol and that D. W. Royster, Sr., of Shelby, President of Capitol, was the person to contact with regard to the property. Pippin went to Shelby and obtained from Capitol, in consideration of $1,000, a written option agreement dated 25 October 1968, by which option Capitol gave Pippin the right until 1 March 1969 to purchase the subject property for $75,000 cash, less the sum paid for the option, the deed to be made to Pippin or "designated owners."

By letter dated 27 February 1969, Pippin notified Capitol that he exercised the option, the letter stating, *inter alia:*

The exercise of the option is subject to our obtaining driveway permits, which should be completed next week.

On 28 February 1969 Capitol responded in a letter addressed to Pippin, which letter contained the following language:

We understand that the exercise of this option is subject to obtaining driveway permit and that you expect to complete same within the next week.

Pippin testified that at the time he exercised the option, he had obtained a purchaser, the KIK Corporation, which planned to place a Roy Rogers Drive-In Restaurant on the property. Later it was decided that Marriott was to be the purchaser and that KIK would lease from Marriott. A few days after notice of the exercise of the option, Pippin's son came to Raleigh and obtained on a plat of the subject property a handwritten notation as follows: "O.K. one 45' Dr. to Wake For. Rd at north parking isle." This notation, dated 2 March 1969, was signed by Don Blackburn, Traffic Engineer for the City of Raleigh, who concededly lacked authority to bind the City of Raleigh to give a driveway permit.

On 21 March 1969 the sale was closed by Marriott's payment of $90,000, of which Capitol received $75,000 and Pippin, $15,000. Subsequent to the closing of the sale, Marriott applied to the Raleigh Planning Commission and to the Raleigh City

Council *for approval of the subdivision* with regard to the lot which Capitol had conveyed to Marriott. On 18 August 1969 the City Council adopted a resolution denying the application. That resolution, *inter alia,* stated as follows:

> It would be contrary to the public peace, safety, and welfare of the inhabitants of the City of Raleigh to approve any subdivision allowing access to Wake Forest Road within 200 feet of the Crabtree Creek Bridge in that said access would create a visual traffic and safety hazard and would in fact violate an established policy of the City. . . .

Thereafter Marriott demanded and received a refund of $15,000 paid to Pippin and tendered a reconveyance to Capitol on condition that Capitol would refund to Marriott the purchase price of $75,000 and the amount of the 1970 ad valorem taxes which Marriott had paid. Capitol refused this tender of reconveyance.

At the conclusion of the evidence, the Court allowed the motion of Lawyers Title under Rule 41 (b) to dismiss, denied Capitol's similar motion, and made findings of fact upon which the Court concluded that both parties to the conveyance mistakenly believed when the sale was closed that the City of Raleigh had granted the buyer a driveway permit and "[t]hat by reason of mutual mistake a contract legally valid was not formed between the parties." The Court thereupon entered judgment that Marriott be allowed to rescind the contract, that it recover from Capitol $75,000 plus the amount paid as taxes, and that it reconvey the property to Capitol.

From this judgment Capitol appealed, including among its assignments of error the denial of its Rule 41 (b) motion to dismiss and the Court's conclusion that because of mutual mistake no legal and valid contract had been formed. Marriott, although seeking to uphold the judgment, filed a cross-appeal, assigning as error the Court's failure to conclude that Marriott had a right to rescind on certain additional grounds alleged in its complaint. In the alternative and in case its judgment against Capitol should be reversed, Marriott appealed from the portion of the judgment which granted the motion of Lawyers Title to dismiss Marriott's claim as to that defendant.

On appeal, the Court of Appeals reversed the determination of the trial court that Marriott was entitled to rescission of the contract by reason of mutual mistake of fact. That Court

also held that Marriott was not entitled to rescind on the ground of illegality of the contract for failure to comply with the Subdivision ordinance of the City of Raleigh, on the ground that Capitol was guilty of actionable fraud, on the ground that the obtaining of a driveway permit was a condition precedent to the exercise of the option and conveyance of the property, or on the final ground that there was a breach of the covenant against encumbrances in Capitol's deed to Marriott.

The Court of Appeals also found no error in the Court's granting of Lawyers Title's motion to dismiss under Rule 41(b), holding that upon the facts and the law Marriott had shown no right to relief under the policy of title insurance issued by Lawyers Title.

We allowed *certiorari* on 4 February 1975.

*Manning, Fulton & Skinner, by Howard E. Manning and John B. McMillan, for plaintiff appellant Marriott Financial Services, Inc.*

*Maupin, Taylor & Ellis by Armistead J. Maupin and Thomas W. H. Alexander, for defendant appellee Capitol Funds, Inc.*

*Poyner, Geraghty, Hartsfield & Townsend, by John L. Shaw and Cecil W. Harrison, Jr., for defendant appellee Lawyers Title Insurance Corporation.*

BRANCH, Justice.

Marriott assigns as error the holding of the Court of Appeals that the trial judge correctly refused to conclude that rescission should be allowed on grounds that the conveyance was illegal because Capitol had not complied with Section 20-5(a) of the Subdivision Standards Ordinance of the City of Raleigh, which provides:

> Before any real property located within the city or located outside the city within two (2) miles in any direction of the corporate limits shall be subdivided and offered for sale, and before any plat thereof shall be recorded in the registry of Wake County, the subdivision plat thereof shall be approved by the city council, and such approval entered in writing on the plat by the city clerk and treasurer, after first having been submitted to the city planning commission in accordance with the provisions of this chapter.

Section 20-11 provides that the Register of Deeds shall not file or record a plat of a subdivision of land within the territorial jurisdiction of the City without the approval of the city council and makes the *filing or recording* of a non-approved plat void. Chapter 921 of the 1955 Session Laws is the enabling act pursuant to which the City Ordinance was adopted. Section 4 of that Act provides:

> Any person who, being the owner or agent of the owner of any land located within the platting jurisdiction granted to the municipality, thereafter transfers or sells such land by reference to a plat which was not recorded in the Office of the Register of Deeds of Wake County, showing a subdivision of such land before such plat has been approved by said legislative body, *shall upon conviction be guilty of a misdemeanor.* [Emphasis supplied.]

[1]  The general rule is that an agreement which violates a constitutional statute or municipal ordinance is illegal and void. *Cauble v. Trexler,* 227 N.C. 307, 42 S.E. 2d 77; *Phosphate Co. v. Johnson,* 188 N.C. 419, 124 S.E. 859; 17 Am. Jur. 2d *Contracts* § 165 at 521; Restatement of Contracts § 580(1). However, there is also ample authority that the statutory imposition of a penalty, without more, will not invariably avoid a contract which contravenes a statute or ordinance when the agreement or contract is not immoral or criminal in itself. In such cases the Courts may examine the language and purposes of the statute, as well as the effects of avoiding contracts in violation thereof, and restrict the penalty for violation solely to that expressed within the statute itself. *Price v. Edwards,* 178 N.C. 493, 101 S.E. 33; *Hines v. Norcott,* 176 N.C. 123, 96 S.E. 899; *Courtney v. Parker,* 173 N.C. 479, 92 S.E. 324; *Ober v. Katzenstein,* 160 N.C. 439, 76 S.E. 476; 17 Am. Jur. 2d *Contracts* § 166 at 523. *See generally* Annot., 55 A.L.R. 2d 481, for cases applying these principles.

The holdings of this Court demonstrate a remarkable divergence in results in cases presenting the question of illegality of contracts because of violation of statutory provisions. The cases generally follow the rule that where certain acts are expressly made illegal, contracts based on such acts are void. *See, e.g., Kessing v. Mortgage Corp.,* 278 N.C. 523, 180 S.E. 2d 823 (limited partnership agreement formed as a part of a usurious loan transaction declared void); *Glover v. Insurance Co.,* 228 N.C. 195, 45 S.E. 2d 45 (insurance company not allowed

---

Financial Services v. Capitol Funds

---

to vary the statutory requirements for a standard fire insurance policy) ; *Courtney v. Parker, supra* (One who violates a statute prohibiting the conduct of business under an assumed name may not enforce against a third party a contract made in the course of such business.) ; *Sharp, Administrator v. Farmer,* 20 N.C. 255 (No action can be based upon an agreement among heirs to pay debts of the decedent and distribute the shares of personal property without taking out letters of administration as required by statute.)

On the other hand, the Court has refused to extend the terms of a penal statute to avoid a contract unless such a result is within the intent of the legislative body. *See, e.g., Price v. Edwards, supra,* (A statutory provision requiring filing of a certificate with the Clerk of Superior Court showing names and addresses of all partners of a partnership operated under an assumed name does not apply between parties who are presumed to possess this information, the purpose of the statute being to prevent fraud upon those who ignorantly deal with the partnership.) ; *Hines v. Norcott, supra; Annuity Co. v. Costner,* 149 N.C. 293, 63 S.E. 304 (The plaintiff executed notes for payment of premiums for life insurance policies and defended his refusal to pay the notes upon a contemporaneous execution of a rebate contract which was made illegal by statute. The Court allowed recovery.).

*Hines v. Norcott, supra,* is analogous to instant case. There plaintiff sued for rent under a lease executed on 13 November 1913 for certain commercial buildings. Defendant denied liability on the ground that the lease was rendered illegal by the adoption in April, 1914, of the following city ordinance:

> . . . Whereas the maintenance and use of surface and dry privies in the town of Greenville is or may become a menace to the public health of the town: Now, therefore, be it ordained by the Board of Aldermen of the Town of Greenville in regular meeting assembled on 2 April, it shall be unlawful for any person, firm, or corporation to erect, maintain, or use any surface or dry privies upon any lot or premises in said town, abutting on any street wherein a sewer-pipe has been laid; and that all owners of said property shall connect with said sewer on or before 1 June, 1914. Any person violating the provisions of this ordinance shall be fined $5 for each offense, and each day said violation shall continue shall constitute a separate offense.

At trial the judge instructed the jury that the question of the plaintiff's violation of the ordinance was "a question between him and the town authorities" and had no bearing upon the lawsuit between the plaintiff and the defendant. This Court also rejected the defendant's contention that there could be no recovery because the lease was rendered illegal by failure to comply with the ordinance. The Court treated the question as one depending upon determination of legislative intent, *i.e.,* "whether it was the purpose to avoid the contract alleged to be contrary to its provisions, or whether it was intended that the penalty alone should be a sufficient punishment." We quote a portion of that opinion:

> . . . The imposition of a penalty for not doing an act which is required to be done may of itself render the doing of the same illegal; but still, if upon a fair construction of the statute it appears to have been the intention of the legislative body to confine the punishment or forfeiture to the penalty prescribed for a violation of it, that intention will be enforced. And the same may be said as to the prohibition of an act, but it does not follow in either case that the illegal act will vitiate a contract which is connected with it only incidentally because it relates to property affected, in some degree, by the statute or ordinance prohibiting or enjoining the act and annexing a penalty for its violation. This ordinance was intended to forbid the "erection, maintenance, or use of surface or dry privies" in the town, and required, in order to prevent any injury to the public health, that they should be connected with sewer-pipes laid in a street adjoining the premises. The lease in this case did not refer at all to the subject-matter of the ordinance, and especially did not stipulate that no such connection should be made, or that such privies should or might be used on the premises. *The town council, in passing the ordinance, surely did not have in mind the prohibition of a lease or sale of the premises, but only the punishment by way of penalty for the violation of its ordinance. . . . It cannot be supposed, upon a proper reading of this evidence, that the council intended to invalidate leases and sales of property merely because the owner of the premises had failed to make the sewer connections. . . .* [Emphasis supplied.]

In reaching its decision, the Court relied heavily on the landmark case of *Harris v. Runnels,* 53 U.S. (12 How.) 79, 13

L.Ed. 901. There, the action was based on a promissory note given for slaves brought into Mississippi and there sold in violation of a statute regulating the importation of slaves into the state and prescribing a one-hundred dollar penalty for each violation thereof. The Supreme Court of the United States, rejecting the defendant's defense of illegality, noted that prior decisions on point had been "fluctuating and counteracting," observed that the purpose of the statute was to exclude from Mississippi all slaves who were tainted with crime, and, *inter alia,* stated:

> . . . [W]e have concluded, before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty, or a penalty only for doing a thing which it forbids, that the statute must be examined as a whole, to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not to be so. In other words, whatever may be the structure of the statute in respect to prohibition and penalty, or penalty alone, that it is not to be taken for granted that the Legislature meant that contracts in contravention of it were to be void, in the sense that they were not to be enforced in a court of justice. . . .

We think that the well reasoned opinion of *Price v. Edwards, supra,* also correctly states the law pertinent to our decision of the question presented. There the administrator of the estate of S. J. Edwards instituted a proceeding seeking final settlement of the estate. His brother, J. H. Edwards, claimed to be a partner in the business and to own a one-third interest therein. The defendants, who, with J. H. Edwards, were the distributees of the estate of S. J. Edwards, filed answers in which they denied that J. H. Edwards was a partner in the business. They also pleaded in bar of J. H. Edwards's right to recover as a partner the assumed name statute, which required that the names and addresses of all partners be filed with the Clerk of Superior Court. The trial judge entered an order which declared that J. H. Edwards was a partner and entitled to a one-third interest in the business conducted by S. J. Edwards at the time of his death and that he had one-third of the proceeds of the partnership business before final distribution. The defendants appealed.

On appeal, the defendants contended that J. H. Edwards could not recover his interest as a member of the partnership because the business was transacted under an assumed name and there had been no compliance with the provisions of the assumed name act. The Court declined to apply the statute to deny recovery in this action wherein the rights of third parties were not affected and declared:

" . . . [E]xcept in those jurisdictions where the rule had been changed by express enactment, all statutes in derogation of the common law are to be construed strictly. Where the statute not only effects a change in the common law, but is also in derogation of common right, it must be construed with especial strictness. . . . The rule to be applied in the construction of all such statutes is that they must not be deemed to extinguish or restrain private rights, unless it appears by express words or plain implication that it was the intention of the Legislature to do so." The statute now under our consideration is clearly penal, as it makes a violation of its provisions indictable and punishable by fine or imprisonment. . . .

Cases from other jurisdictions have considered questions virtually identical to the question presented in instant case. In *Pangborn v. Westlake,* 36 Iowa 546, the plaintiff brought an action to foreclose a mortgage given by the defendant and his wife to the plaintiff. The note which was the basis for the mortgage was given on 13 March 1871, and the mortgage was duly recorded on 20 March 1871. The note was given as payment for six lots in the plaintiff's contemplated addition to the City of Maquoketa, Iowa, which addition was not at the time of the note and mortgage as yet recorded. The plat of the subdivision was duly recorded on 7 October 1871. The defendant admitted the due execution of the note and mortgage but contended that the sale and conveyance of the real estate made by the plaintiff to him was illegal and contrary to an Iowa statute which provided as follows:

. . . [A]ny person or persons who shall dispose of, or offer for sale or lease, for any time, any out or in lots, in any town, or addition to any town or city, or any part thereof, which has been or shall hereafter be laid out, until the plat thereof has been duly acknowledged and recorded, as provided for in chapter 41 of the Code of Iowa, shall forfeit and

Financial Services v. Capitol Funds

pay $50 for each and every lot or part of lot sold or disposed of, leased or offered for sale.

The trial court sustained a demurrer to the defense of illegality, and the defendant appealed. In upholding the action of the trial court and rejecting the defendant's contention that the contract was void, the Court adopted the reasoning of *Harris v. Runnels, supra,* and squarely held that the statute did not avoid the note sued upon.

Likewise, in *De Mers v. Daniels,* 39 Minn. 158, 39 N.W. 98, the plaintiffs brought suit to recover on two promissory notes executed by the defendant to them, and the defendant set up as a defense illegality of the contract for failure to comply with the requirement that the plats be recorded prior to conveyance of the property. In rejecting the defense of illegality, the Court set forth a particularly helpful analysis:

> . . . The only provision in this statute from which it can be inferred that contracts for the sale or leasing of platted lands were intended to be prohibited, and avoided if made, is that which subjects the vendor or lessor, who has not first complied with the requirements of the law, to a pecuniary penalty. If the purpose of this section was also to prevent such sales and contracts by making them illegal, a purchaser, having such knowledge of the facts as any reasonably prudent purchaser would acquire, violates the law, and is as much in the wrong as the vendor. The fact that no penalty, forfeiture, or disability is declared with respect to purchasers, under any circumstances, is worthy of being considered in this connection. The act is wholly consistent with the theory that, as a means of securing the observance of the prescribed requirements as to platting and recording, only the specified penalty should be enforced as a consequence of a disregard of the law. It is in the power of the proprietor, platting his lands, to comply with the requirements of this law. Another person, a purchaser of a portion of the land, cannot do this. A specific penalty is declared for the omission of the former; the statute is silent as to the consequences to the latter.

*Accord: Watrous & Anouffer v. Blair,* 32 Iowa 58; *Bemis v. Becker,* 1 Kan. 226; *Strong v. Darling & Walcott,* 9 Ohio 201; *Kern v. Feller,* 70 Or. 140, 140 P. 735; but *cf. Bronson v. Moo-*

nen, _____ Or. _____, 528 P. 2d 82. *See also State ex rel. Craven v. Tacoma,* 63 Wash. 2d 23, 385 P. 2d 372.

We have discovered cases in two States which appear to take somewhat different positions. An early Missouri case declared void a note given for the purchase of land sold in violation of a platting ordinance and denied recovery by the vendor's assignee. *Downing v. Ringer,* 7 Mo. 585. However, later cases, noting that such statutes impose no penalty upon the purchaser, have held that the violation of the platting requirement does not render the deed void and prevent the passing of title. *Sharp v. Richardson,* 353 Mo. 138, 182 S.W. 2d 151; *Rollins v. McIntire,* 87 Mo. 496; *Mason v. Pitt,* 21 Mo. 391. Similarly, the California cases have held such contracts void. *See, e.g., Hartzell v. Doolittle,* 205 Cal. 17, 269 P. 527; *Smith v. Bach,* 183 Cal. 259, 191 P. 14. At least some later cases, however, have indicated that the contract may not be absolutely void, but merely voidable at the election of the purchaser. *See City of Tiburon v. Northwestern Pacific R. R.,* 4 Cal. App. 3rd 160, 84 Cal. Rptr. 469; *Munns v. Stenman,* 152 Cal. App. 2d 543, 314 P. 2d 67. We do not think it profitable to enter into a detailed discussion of these cases. We merely note that, insofar as they hold that such contracts are void, we decline to follow them.

[2] We look to the language of the enabling act and the city ordinance to ascertain the intent of the legislative bodies. The preamble to Chapter 921 of the 1955 Session Laws indicates that the purposes of the legislation are to prevent urban blight; to discourage the inefficient and inappropriate uses of lands; to deter the creation of conditions which require excessive expenditures for municipal facilities, services, and maintenance; to promote the efficient and wise use of land and the orderly growth of cites and towns by requiring that new subdivisions "be designed in accordance with reasonable standards and comprehensive plans for the growth of the urban areas"; and to provide an adequate means by which the City of Raleigh may effectuate these aims. Such protective legislation must be construed "so that it does not become just another hazard for the unwary." *In re Estate of Peterson,* 230 Minn. 478, 42 N.W. 2d 59. Pursuant to the ordinance, anyone who describes any land in a deed by reference to a subdivision plat which has not been properly approved and recorded is guilty of a crime, punishable as a misdemeanor. The offense is expressly designated, and punishment for its violation clearly stated. The Gen-

eral Assembly has carefully designated the offense, the offender, and the penalty and has made specific provisions to insure enforcement. The inference is "that the Legislature has dealt with the subject completely and did not intend, in addition thereto, that the drastic consequences of invalidity should be visited upon the victim of the offender by mere implication." To hold that the enactment, either expressly or by plain implication, indicates a legislative intent to invalidate the sale of property absent compliance with the subdivision ordinance would visit upon the unfortunate purchasers "a penalty far greater than, and out of all proportion to, the penalty imposed upon the wrongdoer himself." *In re Estate of Peterson, supra.*

In our opinion, and we so hold, the legislative bodies dealt with the matter completely and did not intend to invalidate conveyances of real property because of failure to follow the provisions of this penal legislation. The Court of Appeals correctly decided that the trial judge properly ruled that the sale was not illegal because of statutory provisions of the Raleigh City Code.

Marriott contends that the Court of Appeals erred in reversing the determination of the trial court that it was entitled to rescission on grounds of mutual mistake.

All parties to this appeal apparently concede, and we think correctly so, that plaintiff succeeded to all the rights and obligations formerly held by its assignor, Walter L. Pippin, so as to establish privity of contract between plaintiff and defendant. *Sills v. Ford,* 171 N.C. 733, 88 S.E. 636; *Moore v. Moore,* 151 N.C. 555, 66 S.E. 598.

It is a well-recognized principle that equity will grant relief from the consequences of mistake, "some unintentional omission, or error, arising from ignorance, surprise, imposition or misplaced confidence." 27 Am. Jur. 2d *Equity* § 28. It is not every mistake, however, which will justify the equitable remedy of rescission. The rule is well stated as follows:

> The formation of a binding contract may be affected by a mistake. Thus, a contract may be avoided on the ground of mutual mistake of fact where the mistake is common to both parties and by reason of it each has done what neither intended. Furthermore, a defense may be asserted where there is a mutual mistake of the parties as to the subject matter, the price, or the terms, going to show the want of a consensus ad idem. Generally speaking, however, in order

to affect the binding force of a contract, the mistake must be of an existing or past fact which is material; it must be as to a fact which enters into and forms the basis of the contract, or in other words, it must be of the essence of the agreement, the sine qua non, or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties.

A mutual mistake of such a character as to affect the validity of an executory agreement ordinarily affects the validity of an executed agreement.

17 Am. Jur. 2d *Contracts* § 143; *MacKay v. McIntosh*, 270 N.C. 69, 153 S.E. 2d 800.

[3]  In order for the remedy of rescission to be operable because of mistake of fact, there must be mutual mistake of fact. A unilateral mistake, unaccompanied by fraud, imposition, undue influence, or like oppressive circumstances, is not sufficient to avoid a contract or conveyance. *Tarlton v. Keith*, 250 N.C. 298, 108 S.E. 2d 621; *Cheek v. R. R.*, 214 N.C. 152, 198 S.E. 626. The following pertinent statement aptly summarizes the requirement of mutuality:

... It is said that ordinarily a mistake, in order to furnish ground for equitable relief, must be mutual; and as a general rule relief will be denied where the party against whom it is sought *was ignorant that the other party was acting under a mistake and the former's conduct in no way contributed thereto,* and a fortiori this is true where the mistake is due to the negligence of the complainant. . . . [Emphasis supplied.]

77 Am. Jur. 2d *Vendor and Purchaser* § 51 at 237.

Marriott points to *MacKay v. McIntosh, supra,* as authority supporting its position. In that case the defendant signed a contract to purchase property from the plaintiff in reliance upon the statement of the plaintiff's real estate agent that the subject property was zoned for business, and both the defendant and the plaintiff's agent acted under the mistaken belief that the property was so zoned. This Court held that the evidence supported rescission of the contract because of mutual mistake. *MacKay* is distinguishable from instant case in two respects: (1) the evidence in that case showed that the plaintiff's agents

had innocently but erroneously represented to the defendant that the subject property was zoned for business use, which was the sole use contemplated for the subject premises, and (2) the contract for the sale of real property in that case was executory rather than executed.

[4] Here defendant asserts no equitable defense. For the purpose of our consideration of this question, we assume, without deciding, that plaintiff has established the purchase of the subject property under a mistaken assumption that an effective driveway permit had been obtained by Pippin and that plaintiff would not have purchased the property without such permit. Even so, there is a complete absence of evidence tending to show that this mistaken assumption was induced by any misrepresentation, deceitful action, or misleading silence on the part of Capitol. Neither is there evidence that Capitol knew of the specific purpose for which plaintiff intended to use the property. Under these circumstances, in the absence of an express contrary understanding, the purchaser must assume the responsibility for obtaining the permits necessary for his particular use of the property. Further, there is nothing in the record to indicate that at the time of the conveyance *Capitol knew or should have known that Marriott mistakenly believed that the driveway permit had been obtained. See* Rabin, *A Proposed Black-Letter Rule Concerning Mistaken Assumptions in Bargain Transactions,* 45 Tex. L. Rev. 1273.

These reasons, standing alone, are sufficient to sustain the decision of the Court of Appeals denying relief on the ground of mutual mistake. Nevertheless, the correctness of the decision of the Court of Appeals as to this assignment of error is further sustained by a line of North Carolina cases beginning with *Crowder v. Langdon,* 38 N.C. 476.

In *Crowder,* the plaintiff and the defendant were partners in a mercantile business which had been actively operated by the defendant and one Thomas Whitaker. The plaintiff, being without knowledge of the business, proposed a dissolution of the partnership. The defendant Langdon objected but offered to sell his interest in the business to the plaintiff on the basis of a statement of value made to him by the defendant and assertedly based on the books and information furnished by Whitaker. It was later discovered that the statements as to value of the business were erroneous, and the plaintiff thereupon instituted an action based on fraud and mutual mistake. The

Court, in deciding against the plaintiff, made the following statement concerning mutual mistake:

> ... The general rule unquestionably is, that an act done or a contract made under a mistake or ignorance of a material fact, is relievable in equity. [Citation omitted.] But where the means of information are alike open to both parties, and when each is presumed to exercise his own judgment in regard to extrinsic matters, equity will not relieve. The policy of the law is to administer relief to the vigilant, and to put all parties to the exercise of a proper diligence. In like manner, where the fact is equally unknown to both parties, or where each has equal and adequate means of information, or when the fact is doubtful from its own nature, in any such case, if the party has acted with entire good faith, a court of equity will not interpose. [Citations omitted.] Where each party is equally correct and there is no concealment of facts, mistake or ignorance is no foundation for equitable interference....

In *Wilson v. Land Co.,* 77 N.C. 445, the plaintiff sought cancellation of a deed on the grounds of fraud and mutual mistake. In denying relief the Court, *inter alia,* stated:

> There must always be shown either the mistake of both parties, or the mistake of one with the fraudulent concealment of the other, to justify a court of equity in reforming a contract. [Citations omitted.] In order to set aside such a transaction, it is essential, not only that an advantage should be taken, but there must be some obligation in the party to make the discovery; not an obligation in point of morals only, but of legal duty; the policy of equity being to afford relief to the vigilant and put all parties upon the exercise of the most searching diligence. *This is peculiarly so in cases of written agreements—a solemn deed, as in this case.* The whole sense of the parties is presumed to be comprised in such an instrument, and it is against the policy of the law to allow parol evidence to add to or vary it, as a general rule. But if the proofs are doubtful and unsatisfactory, and the mistake is not made entirely plain, relief will be withheld, upon the ground that the written paper must be treated as the full and correct expression of the intent until the contrary is established beyond reasonable controversy.... [Emphasis supplied.]

*Accord: Cedar Works v. Lumber Co.,* 168 N.C. 391, 84 S.E. 521; *Anderson v. Rainey,* 100 N.C. 321, 5 S.E. 182; *Capehart v. Mhoon,* 58 N.C. 178.

Although this Court will readily grant equitable relief in the nature of reformation or rescission on grounds of mutual mistake when the circumstances justify such relief, we jealously guard the stability of real estate transactions and require clear and convincing proof to support the granting of this equitable relief in cases involving executed conveyances of land. *Maxwell v. Bank,* 175 N.C. 180, 95 S.E. 147. In the recent case of *Hinson v. Jefferson,* 287 N.C. 422, 215 S.E. 2d 102, we said:

> . . . In any event, because of the uncertainty surrounding the law of mistake we are extremely hesitant to apply this theory to a case involving the completed sale and transfer of real property. Its application to this type of factual situation might well create an unwarranted instability with respect to North Carolina real estate transactions and lead to the filing of many non-meritorious actions. Hence, we expressly reject this theory as a basis for plaintiff's rescission.

In instant case it is clear that Pippin assumed the sole risk of error in obtaining the desired driveway permit. Further the record does not disclose that Marriott made any investigation or inquiry concerning access to the property and therefore chose to proceed on its limited knowledge or to assume the sole risk of error. The means of information were equally open to all parties to the transaction. Neither Pippin nor Marriott required a contractual provision in the written instruments avoiding the transaction in case a driveway permit was not obtained.

The lack of diligence on the part of Marriott and Pippin also precludes the intervention of equity to avoid this completed sale and transfer of real property.

For the reasons stated, we hold that the Court of Appeals correctly sustained Capitol's assignments of error directed to the trial judge's findings and conclusions that the sale of the subject property was closed under a mutual mistake of fact.

[5] Plaintiff's argument that the trial court erred in failing to conclude that defendant's conduct amounted to fraud is without merit.

In *Davis v. Davis*, 256 N.C. 468, 124 S.E. 2d 130, this Court stated:

> To obtain relief from a contract on the ground of fraud, the complaining party must show: a false factual representation known to be false or made in culpable ignorance of its truth with a fraudulent intent, which representation is both material and reasonably relied upon by the party to whom it is made, who suffers injury as a result of such reliance. . . .

Here there is not a scintilla of evidence tending to show that Capitol, with fraudulent intent, made a false representation of a material fact which plaintiff relied upon to its injury.

[6] Plaintiff contends that the issuance of a valid driveway permit was a condition precedent to the contract of sale.

The correspondence between Capitol and Pippin took place while the option to convey the property was in effect. This correspondence indicated that Pippin would exercise the option upon obtaining a driveway permit. Pippin thereafter exercised the option by directing that a deed be made to plaintiff. Capitol thereupon executed a deed to plaintiff conveying a fee simple title without reciting conditions which might defeat the conveyance.

> In the absence of fraud or mistake, and in the absence of collateral contractual provisions or agreements which are not intended to be merged in the deed, the acceptance of a deed tendered in performance of an agreement to convey merges the written or oral agreement to convey in the deed, the agreement to convey being discharged or modified as indicated by the deed, and thereafter the deed regulates the rights and liabilities of the parties, and evidence of contemporaneous or antecedent agreements between the parties is inadmissible to vary or contradict the terms of the deed. . . .

77 Am. Jur. 2d, *Vendor and Purchaser* § 290 at 448; 26 C.J.S. *Deeds* § 91c. *See Willetts v. Willetts*, 254 N.C. 136, 118 S.E. 2d 548; *Conner v. Ridley*, 248 N.C. 714, 104 S.E. 2d 845.

We have decided that there was not such mistake or fraud as would permit rescission. We find no evidence of a collateral agreement, not intended to be merged in the deed, which amounts to a condition precedent defeating the conveyance. We

hold that the Court of Appeals correctly decided that the trial judge did not err in failing to conclude that the issuance of a driveway permit was a condition precedent of the contract of sale.

Marriott assigns as error the holding of the Court of Appeals that the trial court correctly granted the motion of Lawyers Title to dismiss under Rule 41 (b). Marriott's position seems to be (1) that the lack of vehicular access to the subject property rendered the title unmarketable and (2) that even if the title is not unmarketable as a matter of law, Lawyers Title nevertheless insured against lack of access to the property and plaintiff does not have such access.

The relevant parts of the driveway ordinance provide:

(b) *Permit required.* No person shall pave a driveway across any public sidewalk, walkway or parkway, or into any street or alley, or cut any curb for the construction of a driveway without first having obtained a permit therefor *as required herein.* . . .

(c) *Application for permit.* Application for such permit shall be made to the director of public works in duplicate, and shall state, among other things, the location, grade, and dimensions of the proposed driveway and the purpose for which it is desired. *If the proposed driveway complies with provisions of this section the director of public works shall issue a permit therefor.* Two sets of plans showing all pertinent information shall accompany the application for all commercial or filling station driveways. Plans for residential driveways shall be furnished when requested by the traffic engineer. The applicant shall comply with section 19-22, and all other ordinances and regulations of the city.

\*     \*     \*

(3) The traffic engineer may decrease the width of any driveway if it would create a hazard to pedestrians or traffic.

(e) *Location and number of driveways.*

(1) The number of driveways servicing any property may be limited to one where it is necessary for purposes of decreasing traffic and pedestrian hazards, as determined by the traffic engineer.

Where special hazards exist adjacent to a lot abutting on two or more streets, the traffic engineer may require, as a condition of the issuance of a permit to construct driveways for access to such lot, that ingress to such lot shall be restricted to one street and egress from such lot shall be restricted to another street and that conspicuous signs be erected and maintained giving notice of the restricted use to which such driveways may be put. Failure of the person having control of such lot to erect and maintain such signs or the use of such driveways by any persons in violation of such restrictions after the erection of such signs, shall be unlawful. [Emphasis supplied.]

The pertinent provisions of the contract insure as follows:

Lawyers Title Insurance Corporation, a Virginia corporation, herein called the Company, for a valuable consideration paid for this Policy, HEREBY INSURES [plaintiff] designated in Schedule A as, and hereinafter called, the Insured, the heirs, devisees, personal representatives of such insured, or, if a corporation, its successors by dissolution, merger or consolidation, against loss or damage not exceeding the amount stated in Schedule A [$90,000], together with costs, attorneys' fees and expenses which the Company may become obligated to pay as provided in the Conditions and Stipulations hereof, which the Insured shall sustain by reason of:

any defect in or lien or encumbrance on the title to the estate or interest covered hereby in the land described or referred to in Schedule A [the subject property], existing at the date hereof, not shown or referred to in Schedule B or excluded from coverage in Schedule B or in the Conditions and Stipulations; or

unmarketability of such title; or

lack of a right of access to and from the land;

all subject, however, to the provisions of Schedules A and B and to the Conditions and Stipulations hereto annexed; all as of the effective date shown in Schedule A of this Policy.

The conditions and stipulations provide, *inter alia:*

2. Exclusions from the Coverage of this Policy

This policy does not insure against loss or damage by reason of the following:

(a) Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or employment of the land, or regulating the character, dimensions, or location of any improvement now or hereafter erected on said land, or prohibiting a separation in ownership or a reduction in the dimensions or areea [sic] of any lot or parcel of land.

(b) Governmental rights of police power or eminent domain unless notice of the exercise of such rights appears in the public records at the date hereof.

(c) Title to any property beyond the lines of the land expressly described or referred to in Schedule A, or title to areas within or rights or easements in any abutting streets, roads, avenues, lanes, ways or waterways (except to the extent the right of access to and from said land is covered by the insuring provisions of this policy), or the right to maintain therein vaults, tunnels, ramps or any other structure or improvement, unless this policy specifically provides that such titles, rights or easements are insured.

The Court of Appeals disposed of this assignment of error by holding that the policy provisions insuring against lack of access apply only "when the insured landowner has no right of access to or from his land." The Court reasoned that even pedestrian access to the subject property was sufficient to preclude liability under the title insurance policy. We do not agree.

[7]   The intention of the parties to an ambiguous policy is to be ascertained by the facts and circumstances surrounding the making of the contract as well as by the language of the contract. The test in construing the language of the contract is not what the insurer intended the words to mean, but what a reasonable person in the position of the insured would have understood them to mean. 43 Am. Jur. 2d *Insurance* § 261 at 320.

[8]   This record shows that the subject property lies adjacent to a heavily traveled street in the City of Raleigh and is located

in a commercial area heavily populated with restaurants, stores, and automobile dealerships. Under these circumstances, it would strain credulity beyond reasonable limits to hold that the parties to this contract understood that the insurance as to access could be satisfied by pedestrian access. To the contrary, the insured must have contemplated insurance protection against lack of vehicular access. It is of interest that § 19-26 of the Raleigh City Code defines a commercial driveway as a driveway providing *vehicular* ingress and egress to and from property used for purposes other than residential.

We hold that when an insurer contracts to insure against lack of access to property, it must be deemed to have insured against the absence of access which, given the nature and location of the property, is *reasonable* access under the circumstances. In instant case mere pedestrian access cannot be deemed to be reasonable access.

However, we reach the same result as did the Court of Appeals. We do not think that the question of whether access has been denied to Marriott properly arises from the facts before us. After Marriott obtained a deed conveying the subject land in fee simple, it applied for *subdivision approval* pursuant to Sections 20-5 and 20-6 of the Raleigh City Code. The procedures for obtaining driveway permits are contained in Section 19-26 of the Raleigh City Code. There is no evidence that Marriott has applied for a driveway permit under this section or any other section of the Raleigh City Code. There is no showing that the proper authorities of the City of Raleigh have refused to issue such permit. Thus, plaintiff fails to show breach of policy provisions insuring access. *Refining Co. v. Board of Aldermen,* 284 N.C. 458, 202 S.E. 2d 129. However, in all probability, it would be an exercise in futility for Marriott to now apply for a driveway permit under the proper provisions of the Raleigh City Code.

It is well recognized in this jurisdiction that exclusions from coverage are construed strictly so as to provide coverage which would otherwise be afforded by the policy. *Trust Co. v. Insurance Co.,* 276 N.C. 348, 172 S.E. 2d 518; *Insurance Co. v. Insurance Co.,* 269 N.C. 341, 152 S.E. 2d 436. Even so, if the language of the policy is plain and unambiguous, the Court must give effect to the policy as written. *Trust Co. v. Insurance Co., supra; Walsh v. United Insurance Co.,* 265 N.C. 634, 144 S.E. 2d 817; 43 Am. Jur. 2d *Insurance* § 279 at 340.

[9]   The City Council's 18 August 1969 resolution rejecting Marriott's application for subdivision approval, in part, stated that "it would be contrary to the public peace, safety and welfare of the inhabitants of the City of Raleigh to approve any subdivision allowing access to Wake Forest Road within 200 feet of Crabtree Creek Bridge. . . . " This unequivocal language makes it clear that the City Council would exercise its police power to deny any application for a driveway permit from Wake Forest Road to the Marriott property, or any other property within 200 feet of Crabtree Creek Bridge.

The provisions of Subsection (b) of the exclusions from coverage in subject policy in plain and unambiguous language exclude from coverage any loss or damage by reason of exercise of governmental police power unless notice of the exercise of such police power appears in the public records on 29 March 1969, the effective date of the policy. According to this record, such notice could not appear in the public records on the effective date of the policy.

For reasons stated the decision of the Court of Appeals is

Affirmed.