**BANK OF HUNTINGDON,**
**Plaintiff-Appellee,**

v.

**Troy SMOTHERS, Defendant,**

**and**

**United States Fidelity & Guaranty Company, Defendant-Appellant.**

Court of Appeals of Tennessee,
Western Section.

Sept. 14, 1981.

Application for Permission to Appeal Denied by Supreme Court Dec. 28, 1981.

Lloyd S. Adams, Jr., Humboldt, ·for de-
fendant-appellant.

W. H. Lassiter, Charles L. Trotter, Jr.,
Huntingdon, for plaintiff-appellee.

NEARN, Judge.

The Chancellor awarded judgment in fa-
vor of the Bank of Huntingdon against
both its former employee and its fidelity
bond carrier USF&G in the amount of
$468,495.75 plus prejudgment interest, less
an amount previously paid by USF&G.
Only USF&G has appealed from that judg-
ment.

In his brief, counsel for appellant sug-
gests five issues for our review. Taken
together, they question (a) the amount of
the judgment, (b) the exclusion of certain
evidence, and (c) the award of prejudgment
interest.

A proper understanding of our treatment
of this matter requires that we set forth the
pertinent facts.

Troy Smothers was an officer and trusted
employee of the Bank of Huntingdon. For
a period of approximately sixteen years pri-
or to discovery, Troy Smothers embezzled
funds from the bank. The embezzlement
scheme had its inception when Smothers
made out fictitious notes and forged thereto
the names of bank customers. As an offi-
cer of the bank he presented the note to a
teller and received the funds represented ·by
the note. When those notes came due,
Smothers created other fictitious notes, ei-
ther to pay the interest due on previous
notes, or to pay the note in full, or to obtain
additional funds. The discovery of Smoth-
ers' disloyal conduct occurred on November
29, 1978. The bank filed a claim with its
fidelity bond carrier, the defendant
USF&G, on December 20, 1978. At that
time there were 190 of Smothers' forged

fictitious notes outstanding with a face balance due and owing the bank of $468,495.75.

No one disputes that the bank suffered a serious loss or that Smothers embezzled funds. The real issue at the trial level was the amount of that loss. The blanket fidelity bond insuring clause is:

(A) Loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss, through any such act of any of the Employees, of property held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor.

However, the policy also contains the following exclusionary clause:

2. In addition to the existing Exclusions in the attached bond, the Underwriter shall not be liable under any insuring agreement for:

(i) Potential income, including but not limited to interest and dividends, not realized by the insured because of a loss covered under this bond.

It was the insistence of the bank that its loss was the balance due on the fictitious notes plus earned interest accrued thereon to the date of the discovery of the defalcation. Accordingly, the bank demanded the sum of $468,495.75 from USF&G.

The defendant USF&G insisted that under the exclusionary clause of the policy, it was obligated to pay only that amount that actually went into the pocket of Smothers and that they were not liable for the payment of any portion of the bank's loss that was represented by interest. It was the insurer's insistence that the Smothers scheme produced a "roll" or "pyramid" effect whereby he embezzled funds to, in part at least, pay off previously created fictitious notes and interest thereon. Therefore, such payments were simply money transfers on the books of the bank and involved no actual loss to the bank; further, such "payment" of interest involved the payment of "Potential income" to the bank and was therefore not covered under the policy.

Prior to the trial of the case, USF&G paid over to the bank the sum of $250,-000.00 as their estimated liability under the policy. By agreement, such payment did not prejudice the right of either party to litigate over the amount of the loss.

In an effort to show their theory regarding the manner in which Smothers rolled or pyramided interest charges, counsel for defense attempted to introduce the transcript of a recorded telephone conversation between a representative of the insurer and Smothers. The bank's representative was not present at the time of the telephone conversation. Counsel for the bank objected to the admission of the evidence on the grounds that it was hearsay. Counsel for the insurer insisted that the evidence was admissible because of exceptions to the hearsay rule. Among those argued exceptions was that regarding statements against interest. The Chancellor sustained the objection and that excluded evidence is preserved in the record. Also, in an effort to prove their theory regarding the amount of the bank's loss, counsel for the insurer sought to adduce from their expert witness, an accountant, that accountant's theory of how Smothers rolled the notes. This testimony was also excluded by the Chancellor and preserved in the record. In this testimony the insurer's accountant went back in the bank's records to examine some of the Smothers fictitious notes which had been paid years ago and for which no claim was made by the bank, in an effort to show that almost half of the bank's claimed loss evidenced by the 190 unpaid notes actually represented monies embezzled to pay principal and interest on previously forged fictitious notes. According to his theory, the amount of loss sustained by the bank was approximately $251,845.56.

It should be noted that since the scheme of embezzlement lasted for sixteen years, many fictitious notes had been paid over that period of time and the bank had no complete records of paid accounts over five years of age. Also, Smothers had taken the fifth amendment privilege in a discovery

deposition taken some several days before the trial. However, the record indicates that Smothers was present in the courtroom on the day of trial and was not called by either the plaintiff or the co-defendant, USF&G, nor did he testify in his own behalf.

We are of the opinion that the evidentiary exclusions complained of by the defendant USF&G are matters of no consequence in this appeal as such evidence whether considered or not is immaterial to the decision of the case.

The crux of this case lies in the interpretation to be given the words "Potential income" contained in the exclusionary clause.

■ In effect, Smothers made unauthorized loans of bank funds to himself. Whether he signed his name, a bank customer's name, or fictitious names to the notes is completely immaterial to his liability to the bank. The law will treat those notes as signed by Smothers for the simple reason that they were signed by Smothers and funds were obtained for his ultimate credit in one name or the other. His liability to the bank is that as found by the Chancellor, that is, the face amount of the note plus unpaid interest. If Smothers had actually signed his own name to each of the notes and when they became due he unauthorizedly borrowed more money to pay those notes and accrued interest, but, before the last in the series became due he fell heir to a large sum of money and therewith paid off all notes, what would have been the loss sustained by the bank? Of course, nothing. However, Smothers did not pay the notes. Therefore, the actual loss suffered by the bank was the principal balance due on the unpaid notes plus accrued interest. In determining the bank's loss, we may not, as insisted by counsel for the insurer, ignore the fact that old notes have been paid and go back to attempt to determine the purpose for which new funds were "borrowed" by Smothers, that is, to put in his pocket or to pay principal and interest or just interest on old notes.

If a new note is created to pay off an old note, such old note is paid off out of the general funds of the bank. When those funds reenter the bank as payment of an old note, even though such payment may represent an interest payment on the old note, it reenters the bank's general fund and loses any interest character it may have had at the time of payment. It matters not a whit whether this is accomplished by an account transfer by the bank or by actually handing out "greenbacks" by one hand and receiving them back with the other. The result is the same. The payment of the old note is realized.

We bring this all out to show the bank's loss *and* to show that Smothers' purpose in obtaining funds is completely immaterial as to that loss.

The policy in question insures against loss but does not insure against loss of potential income. We have shown the loss. The question is then what part, if any, of that loss is potential income. From what we have already said, it should be clear that money advanced to Smothers for whatever purpose from the general funds of the bank cannot be considered as "potential income." It is purely "actual outgo." Therefore, we find no merit in the argument of counsel for the insurer that since new funds were used to pay old interest due on old notes, the new funds must be purged of that portion paid as "interest."

■ We hold that "Potential income, . . . not realized by the Insured" as stated in the exclusionary clause of the policy is that which the bank hopes to receive from the *unrepaid* money loaned, taken, embezzled or stolen from its general fund. In this case, the bank admits that it was its policy on each of the 190 notes to withhold on the front end the interest that would be earned for the term of the note. That is to say, if a note were for the face amount of $2,000.00, for one year, bearing interest at the rate of 10%, only $1,800.00 would be given the borrower at the time the note was executed. As we understand the calculation of loss determined by the Chancellor, the loss included the face amount of the

note, (which included retained front end interest) *minus* the amount of that interest not earned as of December 20, 1978, *plus* the amount of "past due" interest accrued on notes that became due before December 20, 1978. In other words, on the $2,000.00 note hypothesized above, if that note was six months old on December 20, 1978, the loss was determined to be $1,900.00—even though the bank had given Smothers only $1,800.00. We hold that the Chancellor was in error to the extent that the judgment against the insurer includes the amount of front end interest the bank deemed "earned" as of December 20, 1978, and the amount of interest accrued on notes past due on December 20, 1978.

Counsel for the bank argues that interest due and owing is not "Potential income . . . not realized by the Insured" because interest accrued is "realized" income. Referring us to Internal Revenue concepts as well as the bank's treatment of unpaid accrued interest, counsel contends that when income is earned it is realized and thus it is no longer potential. There is no reason, however, to believe that the insuror had Internal Revenue concepts in mind in drafting the exclusionary clause and the bank's treatment of unreceived interest as "realized" for its purposes does not govern the meaning of the insuror's language. The plain meaning of the words "potential" and "realized" leads us to conclude that the insuror meant to exclude unreceived income so that the bank would recover only that which it lost, not the income it hoped to receive from the lost amount. While Smothers may be liable to the bank for earned but unpaid interest, the insuror has specifically excluded such income from its coverage. To read the clause as appellee would have us read it makes the clause virtually meaningless. Such a reading excludes only unearned income, which would not be included in a loss in the first place. Given its plain meaning, the clause excludes earned but unreceived income, which would be included in a broad definition of loss, absent the exclusionary clause. "Earned" and "received" are not synonymous terms.

The record before us is insufficient to enable us to purge from the judgment the potential income as we have defined it. Accordingly, the cause is remanded to the Chancery Court of Carroll County for the necessary proceedings to establish the amount due the bank under the method we have determined and entry of judgment therefor.

■ We find, as did the Chancellor, that this is a proper case for the assessment of prejudgment interest and the judgment below, when entered, shall carry prejudgment interest in the manner previously allowed by the Chancellor. We find no merit in counsel for insurer's argument that prejudgment interest should not be awarded. We do not believe that the defendant insurer is in the habit of keeping its reserves for losses hidden in the bottom of a sugar jar in the kitchen. They are put out at interest. Therefore, we see no reason why they should not be liable for prejudgment interest to the plaintiff on the amount honestly due under their contract with the insured.

Likewise, we find no merit to counsel for appellee's insistence that the insurer should be held liable for a bad faith penalty. We simply would be hard put to say that the prepayment of $250,000.00 to the defendant is an act compatible with bad faith.

The result is that the judgment below as to amount is reversed and the cause is remanded to the Chancery Court of Carroll County for the fixing of an amount consistent with this opinion.

Costs of appeal are adjudged against appellant insurer.

Done at Jackson in the two hundred and sixth year of our Independence and in the one hundred and eighty-sixth year of our Statehood.

MATHERNE and TOMLIN, JJ., concur.