**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**BRANCH BANK AND TRUST COMPANY, Defendant–Appellee.**

No. 86–3627.

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1987.

Decided Dec. 9, 1987.

Roger Arlin Milam (Milam & Strain, Nashville, Tenn., George W. Miller, Jr.;

attempting to intimidate a witness in violation of 18 U.S.C.A. § 1512 (West 1984).

Haywood, Denny, Miller, Johnson, Sessoms & Haywood, Durham, N.C., on brief) for plaintiff-appellant.

Arch T. Allen, III (William D. Dannelly; Moore & Van Allen, Raleigh, N.C., on brief), for defendant-appellee.

Before WIDENER and HALL, Circuit Judges, and KISER, United States District Judge for the Western District of Virginia, sitting by designation.

K.K. HALL, Circuit Judge:

St. Paul Fire and Marine Insurance Company ("St. Paul") appeals from the district court's order granting the defendant's motion for summary judgment in this diversity action. We affirm.

## I.

In April of 1982, St. Paul, an insurance company incorporated in Minnesota, issued a Banker's Blanket Bond insuring Branch Banking and Trust Company ("BB & T"), a bank incorporated in North Carolina. Pursuant to insuring clause (A) of that contract, St. Paul agreed to indemnify BB & T for any "[l]oss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others."

Ten years before the parties entered into this contract, one of BB & T's employees, Thomas O. Riley, launched a scheme to defraud BB & T. The scheme continued from 1972 to the end of 1984. As part of his scheme, Riley issued loans to fictitious persons and deposited the loan proceeds into checking accounts established under corresponding fictitious names. When one of the loans matured, Riley either renewed the loan or created another fictitious loan and applied part of the proceeds to pay principal and interest on the mature loan.

In 1984, several of the loans reached high dollar figures, prompting BB & T to request additional credit information from the borrowers. Riley failed to furnish the necessary information and on December 12, 1984, admitted his guilt to the Federal Bureau of Investigation. At the time of his confession, twelve of Riley's fraudulent loans were outstanding. The total principal due on these loans was $781,500.

BB & T filed a proof of loss with St. Paul, claiming a loss of $750,131.60.[1] St. Paul concluded that $534,206.64 of the proceeds from the outstanding loans had been paid to BB & T by Riley as interest due on earlier loans, and relying on Exclusion (t) of the insurance contract, paid BB & T only $215,924.96. Exclusion (t), commonly known as a potential income exclusion, prohibited recovery of "potential income, including but not limited to interest and dividends, not realized by the Insured."

St. Paul filed suit in the district court seeking a declaratory judgment that the contract's potential income exclusion prevented BB & T from recovering the remaining $534,206.64 from the plaintiff. Both parties filed motions for summary judgment. On August 27, 1986, the district court granted summary judgment for BB & T, awarding it $383,950.53, the difference between the $534,206.64 claimed due and the sum of $150,256.11 which Riley had paid as restitution. 643 F.Supp. 648. This appeal followed.

## II.

On appeal, St. Paul contends that the district court committed reversible error in holding that the potential income provision did not bar recovery in this action. According to St. Paul, BB & T is not entitled to recover the entire principal outstanding on the loans because a portion of the principal from later loans had been used by Riley to pay interest due on earlier fraudulent loans. Because the potential income exclusion prohibits recovery of interest "not realized," St. Paul insists that BB & T cannot recover for this portion of the principal on outstanding loans. St. Paul maintains that

---

1. Although $781,500 was outstanding on Riley's loans when his scheme was discovered, BB & T claimed a loss of only $750,131.60. That sum was calculated by subtracting from its claimed loss a $50,000 deductible and $829.30 in funds recovered from the fraudulent checking accounts and adding $19,460.90 in research expenses.

these interest payments are "not realized," because they were derived from new loan proceeds and therefore cannot constitute a net gain for BB & T. We disagree.

This issue is one of first impression in this Circuit. Only one case has squarely addressed the question. That case, *Bank of Huntingdon v. Smothers*, 626 S.W.2d 267 (Tenn.App.1981), involved a bank employee who engaged in a scheme almost identical to the one involved in the instant case and an insurance company which, as here, refused to pay the bank the entire principal outstanding on the loans on the ground that the contract's potential income exclusion prevented recovery for any portion of the outstanding principal which had been used to make interest payments. The *Huntingdon* court rejected the argument, reasoning that the payments at issue were not interest to the bank:

> [w]hen those funds reenter the bank as payment of an old note, even though such payments may represent an interest payment on the old note, it reenters the bank's general fund and loses any interest character it may have had at the time of payment.... [I]t should be clear that money advanced ... for whatever purpose from the general funds of the bank cannot be considered as "potential income."

We are persuaded by the Tennessee appellate court's holding. However, even if we were inclined to believe that the principal outstanding constituted interest, it could not be construed as unrealized interest within the meaning of the potential income exclusion. Both the testimony of the defendant's accounting expert[2] and common sense support the conclusion that payments that have already been received by BB & T have been realized by them.

We also find no merit in St. Paul's argument that the *Huntingdon* decision is inequitable and that the district court's judgment in this case unfairly permits BB & T to recover profits. The contract at issue here was entered into by consenting, sophisticated business entities and was drafted by St. Paul. It is undisputed that had BB & T not made the loans to Riley, it would have allocated the funds to honest borrowers who would have repaid the principal with interest. Moreover, BB & T has lost more than the $215,924.96 voluntarily paid by St. Paul, because it was required to pay income tax on the interest payments and was unable to recover $50,000 of the outstanding principal due to the policy's $50,000 deductible. In addition, as Judge Kiser, one of the panel members, noted from the bench at oral argument, interest payments cannot be categorized solely as profit, because the real interest rate is only 3% while the remaining interest charged represents inflation, not profits.

Nor can we accept appellant's argument that the district court decision inequitably permits the same recovery for insurees whose contract includes a potential income exclusion as for those whose contract does not contain such a provision. Although the district court held that BB & T was entitled to a recovery for principal that had been used to make interest payments, it also held that the provision *did* exclude the recovery of interest which had accrued but had not yet been paid. In the instant case, that sum amounted to $21,317.78, which cannot be considered an insignificant amount. Clearly, the recovery allowed under a policy with a potential income exclusion is not identical to the recovery possible under a policy without such an exclusion.

### III.

In conclusion, we find no error in the district court's award of summary judgment to BB & T. For the foregoing reasons, we accordingly affirm.

AFFIRMED.

WIDENER, Circuit Judge, concurring:

I concur in the result.

---

2. Harold Q. Langenderger, professor of accounting at the University of North Carolina at Chapel Hill opined that generally accepted accounting principles required BB & T to report the interest payments as income pursuant to the accrual basis of accounting and that the interest payments, although later determined to have been made from the proceeds of fraudulent loans, nevertheless represented realized income to BB & T.

I do so because the defalcation of Riley amounted to a dishonest conversion of the bank's funds when he placed the false notes in the bank. My reasoning is thus akin to that of the Tennessee court in *Smothers*. The fact that the money from the notes was used to pay other false notes at the same bank should be only coincidental. Had Riley previously obtained funds on false notes to other banks and paid the other banks with BB & T's funds, there would be no doubt of liability on the bond. Thus, I would not find it necessary to, nor hold, as does the majority, that the exclusion does not apply because the interest was realized rather than not realized.

I also do not agree with that part of the opinion at the end of page 5 which relies upon an economic theory that "interest payments cannot be categorized solely as profit because the real interest rate is only 3 per cent while the remaining interest charged represents inflation, not profits."

There are two reasons not to rely on this theory. The first is that the man who pays interest at a bank is simply disinterested in economic theories. He pays the bank at the rate of 10 per cent per annum, for example, and the fact that an economist would say he is only paying 3 per cent because of inflation is an economic theory he will find difficult to grasp, as do I. After all, a bank calculates its profits on the 10 per cent charged, not the 3 per cent theoretical level.

The second reason is that we allow recovery on embezzled funds used to pay interest which has never been as low as 3 per cent per annum from the beginning of this scheme in 1972 until its termination in 1984. Without referring back to public sources of data, I suggest that the prime rate during this period has varied from not less than about 5 per cent to about 20 per cent. If we are going to base our opinion on a 3 per cent "real interest rate", then I suggest that not limiting the bank's recovery to the lower rate deserves explanation.